UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

KEVIN COLE, et al.,

      Plaintiffs,

      v.                        Case No. 3:22-CV-935-CCB

CROWN EQUIPMENT
CORPORATION,

      Defendant.

**<u>OPINION AND ORDER</u>**

Plaintiff Kevin Cole ("Mr. Cole") was operating a stockpicker manufactured by Defendant Crown Equipment Corporation ("Crown") during his shift at Bailey's Discount Center in North Judson, Indiana when the stockpicker[1] malfunctioned and continued to raise towards the ceiling. Mr. Cole jumped from the stockpicker, and was injured. Plaintiffs Mr. Cole and Selena Cole ("Ms. Cole" and, together with Mr. Cole, the "Plaintiffs") then sued Crown, asserting several claims. (ECF 2-1).

Crown moves for summary judgment on all claims. (ECF 47). Crown also moves to exclude Plaintiffs' retained expert George Wharton (ECF 46). Plaintiffs oppose Crown's motions and separately move to exclude Crown's retained experts Samuel Sudler and Ronald Grisez. (ECF 57).

---

[1] The machine at issue is referred by several different names in the parties' briefing and in the proffered experts' reports, including stockpicker, forklift, lift truck, picker lift, and SP3500, the model of the machine. For ease of clarity, the Court uses the term "stockpicker" when referring to the machine at issue.

## I.    BACKGROUND FACTS

Crown manufactured and sold a stockpicker to Bailey's Discount Center, Mr. Cole's employer. (ECF 51-4 at 22). The stockpicker has a platform that can raise up to 30 feet. (ECF 47-8). In 2015, Crown and Bailey entered into a planned maintenance service agreement. (ECF 51-3 at 14). Crown agreed to perform routine inspections of the stockpicker every 60 days or 250 operating hours. (ECF 51-2 at 89; ECF 47-6 at 17).

One objective of the planned maintenance is to monitor the wear of the stockpicker's contactors for replacement (ECF 47-6 at 27). Contactors act as an on/off switch for an electrical circuit. (*Id.* at 17-18). Crown trains its maintenance inspectors to observe when or if the contactors need to be replaced. (*Id.* at 28). When a Crown technician inspects a stockpicker, the technician marks a contactor as "OK," which means it is okay or properly functioning, or "R," which means "repair." (ECF 51-2 at 42, 44). The last maintenance visit of the stockpicker before the incident was by Crown employee David Smith on July 7, 2022. (*Id.* at 66). Before Mr. Cole's incident, Crown did not recommend replacement of the contactors. (ECF 47-6 at 28).

On August 17, 2022, Mr. Cole and his coworker Chance Thomas were standing on the platform of the stockpicker when Mr. Cole pressed the "raise" button to lift it to pick a set of cabinets from an elevated rack.(ECF 47-4 at 37-41). Mr. Cole released the "raise" button, but the platform continued to elevate. (*Id.* at 41). Mr. Cole then pressed the emergency disconnect button, which, if functioning, cuts power to the stockpicker, but the platform continued to rise. (ECF 47-8 at 12; ECF 47-4 at 45). The platform continued to rise towards the ceiling, so Mr. Thomas and Mr. Cole jumped off the

stockpicker. (ECF 47-4 at 47-51). Mr. Thomas jumped onto a rack, but Mr. Cole fell to the ground. (ECF 47-4 at 47-51; 51-4 at 81).The platform reached the ceiling and continued to press into the ceiling until another employee disconnected the battery. (ECF 47-4 at 60-61, 80).

This case concerns the failure of two of the stockpicker's electrical contactors that relate to the raise and emergency disconnect features. The first is what is called a P2 contactor, which is associated with the "raise" button feature of the stockpicker. (ECF 47-9 at 16-17). The P2 contactor controls a pump motor that lifts the platform that Mr. Cole was on. (ECF 51-2 at 22). The tips of the P2 contactor were welded together at the time of the accident. (*Id.*) When the tips are welded, the circuit is not able to open, which means it cannot disconnect the power that is being transmitted through that circuit. (ECF 47-6 at 24). So when the P2 contactor welded, it caused the platform to continue to rise. (ECF 55 at 72). The second contactor at issue is what is called the ED1 contactor, which is associated with the emergency disconnect feature. (ECF 47-9 at 16-17). The ED1 contactor controls the emergency disconnect circuit, which provides current and power to the rest of the truck. (ECF 51-2 at 22). At the time of the accident, the ED1 contactor tips were also welded. When both the ED1 and P2 contactors are welded, an operator is unable to de-energize the stockpicker. (ECF 47-6 at 70).

It is undisputed that the power contacts on contactors require periodic inspection because the opening and closing on the contacts wear down, and the material degrades over time. (ECF 47-6 at 42-43). There is no information to indicate that the original

equipment's ED or P contactors were ever replaced on the stockpicker Mr. Cole was operating before the incident. (ECF 47-6 at 22).

## II.  MOTIONS TO EXCLUDE

The Court first addresses Crown's motion to exclude the opinions of Plaintiffs' retained expert George Wharton (ECF 46) and Plaintiffs' motion to exclude the testimony of Crown's experts Samuel Sudler and Ronald Grisez (ECF 57).

### a.  Standard

Expert testimony is admissible at trial under Federal Rule of Evidence 702 if the testimony is relevant to a fact in issue, is based on sufficient facts or data, and results from reliable scientific or other expert methods that are properly applied. *Daubert*, 509 U.S. at 592–93. Before admitting expert testimony, the Court "must determine whether the witness is qualified; whether the expert's methodology is scientifically reliable; and whether the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue." *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 779 (7th Cir. 2017) (internal quotation omitted). The burden to establish the admissibility of an expert's testimony by a preponderance of the evidence falls on its proponent. *Varlen Corp. v. Liberty Mut. Ins. Co.*, 924 F.3d 456, 459 (7th Cir. 2019).

### b.  Crown's motion to exclude George Wharton

Plaintiffs retained George Wharton to evaluate the cause of the accident and identify any conditions or factors that contributed to the incident. (ECF 46-4 at 4). As part of his investigation, Wharton inspected the stockpicker, the ED1 and P2 contactors, and reviewed case-related documents, including depositions. (*Id.* at 5-7). Wharton's

initial report identified 14 conclusions. Crown moves to strike all of Wharton's

proffered opinions, arguing that he is not qualified and that his opinions are based on

an unreliable methodology.

### i. Qualifications

"An expert may be qualified by 'knowledge, skill, experience, training, or

education.'" *Higgins v. Koch Dev. Corp.*, 997 F. Supp. 2d 924, 930 (S.D. Ind. 2014) (quoting

Fed. R. Evid. 702). An expert is qualified to testify if his "qualifications provide a

foundation for [him] to answer a specific question." *Gayton v. McCoy*, 593 F.3d 610, 617

(7th Cir. 2010) (quoting *Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994)). In

other words, courts determine whether an expert is qualified by evaluating each of the

expert's conclusions individually then assessing whether the expert has the "adequate

education, skill, and training to reach them." *Gayton*, 593 F.3d at 617. An expert's

specialization, or lack thereof, "typically goes to the weight to be placed on [his]

opinion, not its admissibility. *Hall v. Flannery*, 840 F.3d 922, 929 (7th Cir. 2016).

Wharton has been a senior mechanical engineer at CED Technologies, Inc. since

2005. (ECF 46-3 at 2). Prior to that, Wharton was an engineer at several other companies

for almost 20 years. Wharton has a bachelor's and master's degree in mechanical

engineering from Ohio State University. (ECF 46-4 at 59). He is a certified operator in

mobile elevated work platforms, telehandlers, and warehouse forklifts. (*Id.*) Wharton is

a registered professional engineer in six states. (*Id.*) Wharton has supervised design

engineers and electrical engineers. (ECF 46-2 at 32-33). Wharton has had on-the-job

training in electrical work. (ECF 47-19 at 157). Wharton previously gave expert

5

testimony in at least one other case regarding a stockpicker similar to Crown's stockpicker (*Id.* at 14-15). Wharton recalled having a dozen other "forklift cases" but he did not testify in those. (*Id.* at 15-16). Wharton was previously proffered as an expert opining as to electrical components in a utility card and the cause of an electrical malfunction. (*Id.* at 22-24). Wharton also issued expert reports on issues regarding electrical components with scissor lifts. (*Id.* at 25). Wharton has also been retained to investigate the fusion of elevator contactors. (*Id.* at 46-47). So while Wharton may not have actual experience with the particular model of stockpicker at issue here, his professional experiences qualify him to opine here. *See Anderson v. Raymond Corp.*, 61 F.4th 505, 509 (7th Cir. 2023) ("Raymond argues that Meyer is unqualified to offer his opinion because he has limited experience with forklifts. That focus is misplaced. An expert's specialization or lack thereof typically goes to the weight to be placed on her opinion, not its admissibility.") (citation and quotation omitted). Considering Wharton's practical experience and technical training, the Court finds that Wharton is qualified to testify as an expert under Rule 702 as to the cause of the accident and identify any conditions or factors that contributed to the incident.

### ii.  Reliability

While the Court finds Wharton is qualified, expert testimony must also be "based on sufficient facts or data; [be] a product of reliable principles and methods; and [reflect] a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702. A qualified expert cannot offer opinions based only on their "say-so." *Sturgis v. R&L Carriers, Inc.*, 554 F. Supp. 3d 976, 981 (N.D. Ind. 2021) (citing *Kumho Tire*

*Co. v. Carmichael*, 526 U.S. 137, 157 (1999). "The fact-specific nature of the *Daubert* gatekeeping inquiry vests considerable latitude in the trial court, both in determining the method by which the reliability of the proposed expert testimony will be measured and whether the testimony is, in fact, reliable." *Jenkins v. Bartlett*, 487 F.3d 482, 489 (7th Cir. 2007) (citing *Kumho Tire*, 526 U.S. at 152)). Crown moves to exclude each of Wharton's 14 conclusions in his expert report, as well as six conclusions proffered in Wharton's supplemental report, arguing that each of the proffered opinions are unreliable and therefore inadmissible under Rule 702. The Court addresses each of Wharton's conclusions in turn.

### 1.  Proffered opinions nos. 1-8

The Court starts with Wharton's proffered opinions nos. 1-8 of his report, which are:

1. The subject stockpicker was maintained by Crown Equipment during the entire life of that stockpicker.

2. The Crown recommended interval for inspecting the contactors was every 60 days or 250 operating hours.

3. The contactors were reportedly inspected by Crown personnel approximately every 60 days, and approximately every 100 operating hours.

4. The ED1 and P2 contactors both welded closed on August 17, 2022, causing the stockpicker's platform to elevate unabated, despite Mr. Cole's attempts to halt the elevation of the platform and to cut power to the to the subject stockpicker.

5. Mr. Kolton Bailey operated the subject stockpicker that morning and reported no operational issues.

6. There is no proof that the ED1 contactor was welded before Mr. Cole got on the stockpicker that afternoon.

7. The P2 contactor could not have welded prior to the subject incident because the platform would have elevated without operator input.

8. Mr. Smith reported inspecting both emergency disconnect contactors and both pump contactors 41 days and 79 operating hours before the subject

incident.

(ECF 46-4 at 54-55)

Crown argues that Wharton's opinions are not expert opinions but instead a recitation of facts. "An expert cannot simply spout facts and dress them up *as* opinions. An expert witness is not a fact witness, and an expert witness is not a mouthpiece for telling the jury facts by calling them 'opinions.'" *Burns v. Sherwin-Williams Co.*, No. 19-CV-5258, 2022 WL 4329417, at \*20–21 (N.D. Ill. Sept. 18, 2022), *aff d*, 78 F.4th 364 (7th Cir. 2023) (emphasis in original). Plaintiffs, as the proponent of the evidence, do not demonstrate how proffered conclusion nos. 1-8 reflect a reliable application of any methodology. Fed. R. Evid. 702. Rather, proffered conclusion nos. 1-6 and 8 are the sort of facts that contribute to an ultimate expert opinion. As to proffered conclusion no. 7, the Court finds that a conclusion that the "P2 contactor could not have welded prior to the subject incident because the platform would have elevated without operator input" sounds more in opinion than fact. However, as stated, Plaintiffs do not demonstrate how any of Wharton's proffered conclusions contained in numbers 1-8, including number 7, reflect a reliable application of any methodology. While Wharton may rely on facts and other evidence in rendering his opinions,  proffered conclusions nos. 1-8 are inadmissible to the extent Plaintiffs seek to admit those statements as expert opinions under Rule 702.

### 2.  Proffered opinion no. 9

Next, Crown seeks to strike Wharton's proffered opinion no. 9 of Wharton's report, which states:

9.    During the last planned maintenance prior to the subject incident, Mr. Smith improperly installed an electrical harness, causing issues, including a blown control circuit fuse.

(ECF 46-4 at 55).

Crown argues that conclusion no. 9 is a factual summary of the service work performed; therefore, it is not an expert opinion. When questioned about this proffered conclusion at his deposition, Wharton testified:

Q. Let's look at number 9. "During the last planned maintenance prior to the subject 16 incident, Mr. Smith improperly installed an electrical harness, causing issues, including a blown control circuit fuse." Did I read that right?

A. Yes.

Q. Okay. You would agree this also is not really an opinion, correct?

A. No, that was as it's reported.

Q. Reported by Mr. Smith?

A. Yes.

Q. Okay. Do you believe David Smith's installation of the remote raise lower harness on July 7, 2022 played any role in Mr. Cole's accident?

A. I don't know.

Q. As you sit here today you have no opinion on that; is that fair?

A. I have an opinion that I don't know.  I don't have an opinion that it played a role in the accident, if that's what you're asking.

(ECF 47-19 at 119-20).

Based on Wharton's testimony, the Court agrees with Crown that proffered conclusion no. 9 is not an expert opinion because Wharton testified that it is a factual summary of the record reported by Smith. As stated, Wharton may rely on the factual record in forming his ultimate conclusions, but Wharton's conclusion no. 9 is inadmissible to the extent his conclusion is proffered as expert testimony under Rule

9

702 because Plaintiffs do not demonstrate how conclusion no. 9 reflects a reliable

application of any methodology.

### 3. Proffered opinion no. 10

Next, Crown moves to strike Wharton's proffered opinion no. 10 of his report,

which states:

> 10. During that same visit, Mr. Smith improperly rewatered the battery prior to charging. Mr. Smith had improperly rewatered the battery before charging on the subject stockpicker at least four times.

(ECF 47-18 at 55).

Crown argues that it is a factual summary of Smith's service work, which

Wharton did not ultimately rely on in reaching his opinions, but that is not supported

by Wharton's testimony. When asked about proffered opinion no. 10, Wharton testified:

> Q. Number 10. "During that same visit, Mr. Smith improperly rewatered the battery prior to charging. Mr. Smith had improperly rewatered the battery before charging on the subject stockpicker at least four times." Did I read that correctly?
>
> A. Yes.
>
> Q. Okay. What is your source for this information?
>
> A. Basically his inspection reports.
>
> Q. And this is kind of a fact or observation, fair?
>
> A. Well, I mean, my opinion that it's improper is a -- it's an opinion.
>
> Q. Okay.
>
> A. So ...
>
> Q. And that's -- what's your basis for that opinion?
>
> A. The recommendations on how to properly rewater the battery.
>
> Q. And the recommendations you're referencing are located where?
>
> A. If I remember right, it's in the service manual.

(ECF 47-19 at 122-23).

Wharton then goes on to testify that the rewatering of the battery may have caused the accident, explaining that "corrosion is indicative that the problem was there and that might have impacted the battery's robustness, such that it might have gone into a low voltage condition at the time of the incident, which increase the current. And high current is causative of the damage to the contactors." (*Id.* at 123). Plaintiffs have therefore shown that proffered conclusion no. 10 is based on documents Wharton reviewed in preparation for the report, including Smith's inspection records and the service manual, which support Wharton's conclusion as to what role, if any, the rewatering of the battery may have had in causing the accident. The Court therefore denies Crown's motion to exclude proffered conclusion no. 10.

### 4.   Proffered opinion no. 11

Crown also moves to exclude opinion no. 11 of Wharton's report:

> 11. Mr. Smith's practice of clearing codes without recording the available code histories defeated the value of having the stockpicker controller log the chronological and accumulated histories. Mr. Smith cleared the codes during litigation of this matter and without permission from Bailey's. The accumulated error codes could have provided evidence probative to this investigation.

(ECF 46 at 5).

In Plaintiffs' response in opposition to Crown's motion to exclude, Plaintiffs explain that Smith wiped all error codes stored in the stockpicker's memory when he serviced the stockpicker following the incident. (ECF 53 at 5). Plaintiffs also argue that wiping of the codes interfered with the Plaintiffs' efforts to source the cause of the contactor failures and "warrants a spoliation inference." (*Id.*)

As a preliminary matter, Plaintiffs have not filed any motion for sanctions arising from the alleged destruction of evidence—such as an adverse inference for the wiping of error codes. Thus, that issue is not properly before the Court.

Second, Plaintiffs have failed to show how Wharton's statement is admissible as expert opinion testimony under Rule 702. Wharton may rely on the fact that there were no error codes to review because they had been wiped following the incident in opining what may have caused the incident, but Plaintiffs do not demonstrate how proffered conclusion no. 11 about there not being error codes reflects a reliable application of any methodology. Even at Wharton's deposition, he testified that he did not know what those codes were and "didn't pursue that line of questioning because I was told—I mean I knew that there wasn't any codes to consider." (ECF 47-19 at 134). Accordingly, to the extent Plaintiffs intend to present Wharton's proffered conclusion no. 11 as Rule 702 expert opinion testimony, Crown's motion is granted, with the understanding that Wharton may rely on the fact that there were no error codes to review when forming his opinion as to the cause of the incident.

### 5. Proffered opinion no. 12

Crown also moves to exclude Wharton's proffered opinion no. 12 of his report, which states:

> There was no evidence of excessive current or any other issue with the subject stockpicker that could have caused the ED1 and P2 contactors to weld suddenly. The only explanation for their condition at the time of the incident was progressive damage due to formation of metal oxides and heat from high-resistance connections at the contacts.

(ECF 46 at 5-6).

At Wharton's deposition, he explained that contactors "start out as two flat surfaces" and so "at any point between these two contacts the current is flowing somewhat uniformly in that whole cross section." (ECF 47-19 at 158). Wharton further testified that the contactors wear over time, which leads the contacts to only touch at a point instead of the whole surface, resulting in a higher current. (*Id.*) With a higher current at that point, it leads to higher resistance, which in turn makes more heat. (*Id.* at 158-159). Wharton explained that the high resistance connection makes voltage lower at the motor, and when the voltage is lower, it takes more current to drive the load, thereby further increasing the current. (*Id.* at 159). Wharton testified that degradation of contacts happen over time. (*Id.* at 97).

Crown argues that Wharton's proffered opinion did not eliminate other possible causes which could result in the electrical contactors welding, such as the dusty environmental conditions at the Bailey warehouse. In support, Crown points to testimony from Wharton that he is not aware from his own research or experience whether dusty environmental conditions broadly can be causative of welding. But Wharton did testify that the other two contactors that were part of the mechanism that did not fuse were exposed to the same environmental conditions including the same exposure to dust as the two contactors that did fuse, and so, he opines, one would expect all of the contactors to be in the same condition, which supported his conclusion that there was a circuit issue. (ECF 47-20 at 18). The Court therefore finds that Wharton's conclusions are not based solely on subjective belief or speculation but based on Wharton's engineering experience. Plaintiffs have demonstrated by a preponderance

of the evidence that Wharton's conclusion that the only explanation for their condition

at the time of the incident was progressive damage due to formation of metal oxides

and heat from high-resistance connections at the contacts is admissible under Rule 702.

To the extent Wharton failed to consider or investigate other alternative causes, and

whether there is a possibility of other causes, is properly left to cross-examination.

*Gayton v. McCoy*, 593 F.3d 610, 619 (7th Cir. 2010).

### 6.  Proffered conclusion no. 13

In conclusion no. 13 of Wharton's report, he opines:

> If the ED1 and P2 contactors were properly inspected and were in good
> condition on July 7, 2022 at 3885 hours, then they could not have been degraded
> to the extent that they were on August 17, 2022 at 3964 hours, based on Crown's
> position that the contactors only required inspection only every 60 days or 250
> hours.

(ECF 46 at 6).

Crown moves to exclude proffered conclusion no. 13, arguing that Wharton

presents no explanation or evidence to support his conclusion that an alternative

maintenance interval would have prevented the incident.

 Wharton opines that, to determine whether a contactor should be replaced, a

technician should evaluate whether the silver alloy is on the majority of the surface.

(ECF 47-19 at 142-143). Wharton also opines that a contactor can be in "bad shape"

which is "predictive of failure," and that it is negligent to only inspect whether a

contactor is working properly, because contacts should be replaced before "they get bad

enough to fuse." (*Id.* at 140-141). But when asked what an appropriate inspection

interval should be in order to prevent the contactors from degrading to the point of

welding, Wharton testified:

Q. Okay. So as you sit here today, you don't have any opinion regarding what the appropriate inspection interval of the contactors should be; is that fair?

A. Depends again whether [Smith] was negligent or not. If he wasn't—I'm sorry. If he was negligent, then maybe 250 hours is the right answer.

….

Q. As you sit here today are you able to say whether any different interval would have made any difference in the August 17, 2022 incident involving Mr. Cole?

A. Not without knowing how well he inspected them.

Q. Have you done any testing to evaluate the time it takes for contactors to weld in these conditions?

A. No.

(*Id.* at 145-147).

Plaintiffs do not point to anywhere in the record where Wharton explains the basis for his proffered conclusion that the contactors could not have been degraded to the extent that they were on August 17, 2022 based on Crown's position that the contactors only required inspection every 60 days or 250 hours. Wharton has no opinion on how long it takes for contactors to weld or what an appropriate inspection period would be if the contactors were properly inspected by Smith. Wharton's only apparent basis for that conclusion is the undisputed fact that the contactors welded, which does not reflect the application of any methodology. So while Wharton may opine that, based on his experience, contactors degrade over time, and how a technician should determine whether a contactor should be replaced, Wharton's proffered opinion that Crown should have inspected the contactors earlier than its scheduled maintenance inspection rests merely on speculation and does not reflect the product of any reliable methodology. Such proffered opinion is therefore inadmissible under Rule 702 because it is not reliable or helpful for the jury. *See Minix v. Canarecci*, 597 F.3d 824, 835 (7th Cir.

2010) ("Given Gutierrez's failure to explain his methodology, the district court could

conclude that the report offered nothing of value to the judicial process.").

### 7. Proffered conclusion no. 14

Finally, Crown moves to exclude Wharton's proffered conclusion no. 14 of his

report where he opines:

> There are two possibilities. Either Mr. Smith was negligent in his inspection of
> the ED1 and P2 contactors on July 7, 2022 when Smith was struggling to properly
> install the remote raise harness. Or 250 hours is not the appropriate inspection
> interval, because the contactors became welded within 79 hours after their
> condition was approved by Mr. Smith.

(ECF 46-4 at 55).

Wharton's proffered opinion that Crown acted negligently either through the

acts of its technician or by its maintenance schedule are inadmissible legal conclusions.

See *Good Shepherd Manor Found. v. City of Momence,* 323 F.3d 557, 564 (7th

Cir.2003) ("[E]xpert testimony as to legal conclusions that will determine the outcome of

the case is inadmissible."); *Superior Aluminum Alloys, LLC v. U.S. Fire Ins. Co.,* No. 1:05-

CV-207, 2007 WL 4618463, at *9 (N.D. Ind. June 25, 2007) ("Indeed, expert opinions that

proclaim that a party is negligent are generally inadmissible") (collecting cases). An

expert is generally permitted to testify to the relevant standards of care in a particular

industry. *Superior Aluminum Alloys, LLC,* 2007 WL 4618463, at *10. And as Plaintiffs

point out in their response, Wharton does opine on how a technician should evaluate

whether a contactor should be replaced. *See* ECF 47-19 at 142-143) (explaining a

technician should evaluate whether silver alloy is on the majority of the surface). Such

testimony is helpful for a jury to determine what a reasonable standard of care is with

respect to the maintenance of the contactors, and whether Crown's actions fell below that standard of care. But proffered opinion no. 14 is an impermissible legal conclusion, and so the Court grants Crown's motion to exclude Wharton's proffered opinion no. 14 that "Mr. Smith was negligent in his inspection of the ED1 and P2 contactors on July 7, 2022 when he was struggling to properly install the remote raise harness. Or 250 hours is not the appropriate inspection interval, because the contactors became welded within 79 hours after their condition was approved by Mr. Smith." *See Webster Bank, N.A. v. Pierce & Assocs., P.C.*, No. 16-CV-2522, 2020 WL 616467, at *5 (N.D. Ill. Feb. 10, 2020) ("Murphy cannot tell the jury that Pierce violated the standard of care—that is the very question the jury will answer. It is the jury's role to determine whether Pierce violated the standard of care, not Murphy's.).

Wharton's proffered conclusion that Crown acted negligently through the acts of Smith or by its maintenance schedule is also inadmissible because his opinion rests only on speculation. When asked for the basis of Wharton's proffered opinion that Smith acted negligently, Wharton testified that, because the contactors were fused, that means they were "in a bad condition" and "[s]o if it was fused, then I'm assuming that that means that [Smith] didn't perform those inspections and tests[.]" (ECF 47-19 at 97). He also testified the following:

> Q. What evidence, if any, can you point me to that Mr. Smith was negligent?
>
> A. The shortness of time from the time he inspected it until the time of the incident and the condition they were in at the time of the accident.
>
> Q. So the mere fact that he inspected on July 7, 2022 and the incident occurred on August 17, 2022? Is that what you're referencing?

A. The time and the hours, yes.

Q. And—the operational hours?

A. Right.

Q. Okay, is there anything else you're basing that opinion on?

A. That's—that's two sides of the same coin. Either they can get bad very fast and the interval's too long or it took a long time to get bad, the interval's fine but he didn't detect it.

Q. But as you sit here today you don't know which it is, right?

A. No.

(ECF 46-2 at 145-46).

Wharton therefore relies on speculation and the mere fact that the incident occurred in forming his opinion that Smith acted negligently, and so Plaintiffs have failed to show that Wharton reliably applied his expertise in reaching his conclusion that Smith acted negligently.

As to Wharton's opinion that Crown acted negligently by its maintenance schedule, as previously stated, Wharton does not have an opinion on what an alternative schedule could be or how long it takes for a contactor to degrade, and so his proffered opinion that Crown acted negligently based solely on the contactors being fused is insufficient for Plaintiffs to show by a preponderance of the evidence that Wharton's opinion is the product of a reliable methodology, so it is inadmissible under Rule 702. Crown's motion to exclude proffered conclusion no. 14 from Wharton's report is granted.

### 8. Wharton's proffered conclusions in his supplemental report

Crown also moves to exclude six proffered conclusions in Wharton's supplemental report. (ECF 46-7). Crown argues that the report is untimely.

The deadline for Plaintiffs' and Crown's expert disclosures was January 8, 2024 and February 8, 2024, respectively. (ECF 28). The date of Crown's retained experts reports from Samuel Sudler and Ronald Grisez is February 8, 2024. (ECF 46-6; 47-9). Assuming that the reports were served that day—which Plaintiffs do not contend that the reports were untimely served—this means that any rebuttal report under Fed. R. Civ. P. 26(a)(2)(D) was due March 9, 2024, 30 days after service of Crown's expert reports. The date of Wharton's supplemental/rebuttal report is June 7, 2024, which was the deadline for completion of all discovery. (ECF 46-7; ECF 33). Plaintiffs do not address Crown's contention that Wharton's supplemental/rebuttal report is untimely in their briefing or otherwise argue that their failure to comply with Rule 26(a) is harmless or justified. *See Westefer v. Snyder*, 422 F.3d 570, 584 n.21 (7th Cir. 2005). Since Plaintiffs fail to show that Wharton's supplemental report (ECF 46-7) complies with the Court's scheduling order or Rule 26, the Court grants Crown's motion to strike Wharton's supplemental report, ECF 46-7.

### c. Plaintiffs' motion to exclude Samuel Sudler III

Plaintiffs also move to exclude six proffered opinions from Crown's expert Samuel Sudler III. Plaintiffs do not argue that Sudler is unqualified, only that his opinions are speculative and not based on reliable principles and methodology.

Sudler is a senior electrical engineer at S-E-A, and has worked at S-E-A as an electrical engineer for over 20 years. (ECF 62-1 at 1). Before that, Sudler was an electrical engineer at several other companies for over 10 years. Sudler has professional registration in dozens of states. (ECF 62-1 at 3). Sudler is a member of several professional committees. Sudler has a bachelor's in electrical engineering from the University of Pittsburgh. (ECF 62-1 at 1).

In Sudler's report, he explains that he was retained by Crown to conduct an electrical evaluation and investigation to determine whether an electrical malfunction or failure associated with the stockpicker occurred during the incident. (ECF 46-6). He states that his conclusions are based on his experience, a joint examination of the stockpicker from the incident, including the P2 and ED1 contactors, an evaluation of discovery documents, deposition testimony, expert reports, Crown's manual for the stockpicker, and other reference materials. (ECF 46-6 at 6). Sudler's report lists four conclusions:

1) It is the opinion of S-E-A that the testing, evaluation of the electrical control system and its associated items for the subject Crown Model SP3520 did not reveal evidence of a manufacturing or design defect with the unit.

2) It is the opinion of S-E-A that the damaged electrical contacts for the ED1 an[d] P2 contactors were the outcome of excessive current that developed into electrical arcing and shorting that resulted in the contacts eventually becoming welded.

3) It is the opinion of S-E-A that the Crown Model No. SP3520 Serial No. 1A422477, had been designed, functioned, and operated in accordance with all applicable ANSI and UL standards.

4) It is the opinion of S-E-A that the planned maintenance services provided by David Smith of Crown Equipment Corporation, according to his deposition testimony, involving the inspection of the ED1 and P2 contact was done with reasonable skill and care with the contacts not exhibiting evidence of a maintenance issue during the July 7, 2022, inspection, which was the (sic) last performed before the August 17, 2022 incident.

20

(ECF 46-6 at 7).

In Plaintiffs' motion, they seek to exclude some of Sudler's enumerated conclusions, as well as several statements that are made throughout his report. The Court will address Plaintiffs' arguments in turn.

### i. Sudler's proffered conclusion no. 4

First, Plaintiffs move to strike the fourth proffered opinion in Sudler's report that Smith's inspection was done with reasonable care and that the contacts did not exhibit evidence of a maintenance issue during Smith's July 7, 2022 inspection before the incident. (ECF 46-6 at 7). Plaintiffs argue that Sudler's conclusion suggests that Sudler only relied on Smith's own deposition testimony and not on any reliable scientific principle or method under Rule 702, and is speculative. Plaintiffs also argue that Sudler's opinion about the quality of Smith's care is not helpful to the jury.

When determining whether an expert's testimony is reliable, "[i]t is critical under Rule 702 that there be a link between the facts or data the expert has worked with and the conclusion the expert's testimony is intended to support." *United States v. Mamah,* 332 F.3d 475, 478 (7th Cir.2003) (citing *Gen. Elec. v. Joiner,* 522 U.S. 136, 146 (1997)). Even if an expert's testimony is deemed reliable, it must be excluded if it is not relevant, which means that it is not likely "to assist the trier of fact to understand the evidence or determine a fact in issue." *United States v. Hall,* 93 F.3d 1337, 1342 (7th Cir.1996).

A review of Sudler's report and deposition testimony demonstrates that Sudler relied on more than Smith's deposition in reaching his conclusion. As stated, Sudler conducted an inspection of the stockpicker and the contactors. In Sudler's report, he

opines that it is common to see minor pitting or blackening in the area of the contacts, which is normal and does not require the contacts to be replaced. (ECF 46-6 at 46). At his deposition, Sudler explained that he looked at the wiring and the contactors, as well as the evidence and the damage that he sees is "consistent with the electrical schematics and the layout of this particular truck." (ECF 62-2 at 78). Sudler also testified that it is his view that the contacts were not degraded over time (*Id.*)

As stated in the Court's discussion of Crown's motion to exclude Wharton, experts are not allowed to proffer opinions that are legal conclusions, including a conclusion about whether an individual acted negligently. But experts are generally permitted to testify to the relevant standards of care in a particular industry, and a defendant's performance in light of those standards. *Richman v. Sheahan*, 415 F. Supp. 2d 929, 945 (N.D. Ill. 2006); *Superior Aluminum Alloys, LLC v. U.S. Fire Ins. Co.,* No. 1:05-CV-207, 2007 WL 1850858, at *10 (N.D. Ind. June 25, 2007). To the extent Sudler's opinion is impermissibly proffering a legal conclusion as to whether Smith negligently maintained the stockpicker, such an opinion would be an impermissible legal conclusion. But Sudler is permitted to opine on Smith's performance in light of the standard of care in the industry, and that the contactors could not have been degraded to the point they required replacement at the time he inspected it. Crown has shown by a preponderance of the evidence that such a conclusion is reliable. Sudler's opinion is also helpful to the jury to determine what a reasonable inspection or maintenance schedule is. Plaintiffs' motion to exclude is therefore denied.

### ii. Sudler's opinion related to cause of contactor damage

Plaintiffs also move to strike several statements in Sudler's report that are part of Sudler's analysis underlying his enumerated proffered conclusions. The first statement is that an "[e]xamination of the P2 contact also revealed evidence of severe melting and damage as seen in Figure 28 through Figure 34 which could only be caused by electrical arcing and shorting beyond the normal use of the contacts in the truck." (ECF 46-6 at 33). Plaintiffs argue that Sudler's conclusion is unreliable and speculative because he did not rule out other obvious alternative explanations, such as that Crown failed to replace the work-out contactors at the planned maintenance appointment before they failed because of an accumulation of normal wear and tear.

"[A]n expert need not testify with complete certainty about the cause of an injury; rather he may testify that one factor could have been a contributing factor to a given outcome." *Gayton v. McCoy*, 593 F.3d 610, 619 (7th Cir. 2010). In his report, Sudler explains that an examination of the ED1 and P2 contacts revealed evidence of electrical arcing and shorting in the form of melted metals. (ECF 46-6 at 40). A review of Sudler's report shows that he considered other causes, including that an increase of weight on the stockpicker could lead to an increase in current that then may lead to melting of the contacts and welding, but that there is no evidence to suggest that Bailey's was moving product beyond the stockpicker's capacity. (*Id.*) He also explains in his report that overwatering the water level of the battery could not have increased the load of the electrical circuit. (*Id.* at 45). Sudler therefore did not fail to consider or investigate other alternative causes, and whether there is a possibility of other causes is properly left to

23

cross-examination. *Gayton*, 593 F.3d at 619. Plaintiffs' motion to strike Sudler's proffered opinion that the damage observed on the P2 contactor was caused by electrical arcing and shorting beyond the normal use of the contacts in the truck is denied because Crown has demonstrated by a preponderance of the evidence that Sudler's conclusion is reliable under Rule 702.

### iii.  Sudler's opinion regarding excess current conditions

Next, Plaintiffs move to strike another statement in Sudler's report where he concludes that "for the ED1 and P2 contactors to become damaged, as shown previously in Figure 20 through Figure 34, the contactors had to be subjected to conditions that caused the current to be in excess of the rated values that are beyond the aforementioned testing," as unreliable for failure to rule out other alternative causes (ECF 46-6 at 38). Sudler's statement is part of Sudler's methodology supporting his opinion as to what he believes caused the contactors to be damaged. In Sudler's report, he explains how Underwriters Laboratories ("UL"), a product safety certification organization, conducted a series of performance tests for the model of stockpicker at issue here. (ECF 46-6 at 37). One of those tests was the Arc-Rupturing Test, where a "switch and current-rupturing device connected in the motor circuit, such as a contactor and a speed controller, shall show no welding or complete disintegration of the contact material; and the device shall make the load circuit. When subjected to 100 cycles of making and breaking the stalled motor current of the motor that it controls, there shall be no arcing to the frame or enclosure nor other manifestation of a risk of fire such as the burning or melting of the lead insulation; and the device shall continue to function

both mechanically and electrically" (*Id.* at 37-38). The stockpicker met the requirements of the Arc-Rupturing Test among other performance tests, and became UL certified. Sudler then opines that, since the stockpicker passed the Arc-Rupturing Test, then the contactors had to be subjected to conditions that caused the current to be in excess of the rated values beyond those in the Arc-Rupturing Test. (*Id.* at 38). While Plaintiffs take issue with Sudler not considering other alternative causes, as stated, Plaintiffs can address that on cross-examination. Plaintiffs' motion to strike Sudler's opinion regarding excess current conditions is denied.

### iv.   Sudler's proffered opinion no. 3

Next, Plaintiffs move to exclude proffered opinion no. 3 in Sudler's report where he concludes that "it is the opinion of S-E-A that the Crown Model No. SP3520-30 Serial No. 1A422477, had been designed, functioned, and operated in accordance with all applicable standards." (ECF 46-6 at 7). Plaintiffs argue that, in proffering that opinion, Sudler only relied on the fact that the stockpicker was UL certified. But as Crown points out, Sudler is a member of the UL technical committee (ECF 62-1 at 5). His report details what the UL is, and the tests UL performs as part of its certification process. Crown therefore has shown by a preponderance of the evidence that Sudler's opinion as to whether the design, function, and operation of the stockpicker is up to standards is based on a reliable methodology. Whether UL certification is adequate or sufficient to support Sudler's proffered conclusion is for Plaintiffs to address on cross-examination. Plaintiffs' motion to strike Sudler's proffered opinion no. 3 is denied.

### v. Sudler's statements regarding excessive wear and damage, and environment conditions

Plaintiffs also move to strike a statement in Sudler's report where he opines that "[i]n addition this excessive wear and damage would have occurred after the July 7, 2022, inspection and before the August 17, 2022, incident" as speculative and not based on the application of reliable principles and methods. (ECF 46-6 at 46). But in Sudler's report, he explains that when inspecting contacts used in a motor application, it is common to see minor pitting or blackening in the area of the contact, which is normal and does not require contacts to be replaced. As already stated, Sudler discusses how his examination of the ED1 and P2 contacts revealed evidence of electrical arcing and shorting, and he considered other potential alternative causes such as excessive weight. (*Id.*at 40). At Sudler's deposition, he testified that the only way the contacts got to the point of melting and then fusing but not blow a fuse is with a high resistance connection, and the only way he opines that could have occurred is with dust in the environment. Sudler further testified that, because Smith's checklist at his inspection includes looking and blowing out dust, and that Smith marked that task as "okay" to mean he had blown the dust out, so that the dust could have accumulated following the inspection. (ECF 62-2 at 26). While Plaintiffs take issue with Sudler relying on Smith's testimony to support his conclusion that there was no dust at the July 7, 2022, inspection and that Sudler did not see other evidence that showed there was dust at that time, Sudler can rely on evidence, including deposition testimony, in support of his proffered opinions. *See Burns v. Sherwin-Williams Co.*, No. 19-CV-5258, 2022 WL 4329417, at *20

(N.D. Ill. Sept. 18, 2022), *aff'd*, 78 F.4th 364 (7th Cir. 2023) ("An expert can rely on facts to support his or her opinions. Facts are building blocks, and summarizing the record is fair game if the point is to support opinions."). Whether Sudler's reliance on Smith's July 2022 inspection notes and lack of other evidence that there was dust at the July 7, 2022 is sufficient to support Sudler's conclusion that dust accumulated following the inspection and caused the contactors to weld can be addressed on cross-examination.

For these same reasons, Plaintiffs' motion to strike Sudler's statement in his report that the "other instance in which the electrical contacts for ED1 and P2 can be adversely affected and lead to the welding of the contacts is with the dusty environment identified with subject Crown SP3520-30 unit….[i]t is important to note that these environmental conditions identified at the Baileys Discount Center only occurred after the July 7, 2022 Crown planned maintenance, and after the contactors were changed August 25, 2022" (ECF 46-6 at 47-48) is also denied. Plaintiffs again argue that Sudler does not know when the dust he observed came to be present on the machine, and that he fails to consider an obvious alternative explanation for the dust—that the dust accumulated because of the incident when the stockpicker hit the ceiling. But, as stated, Crown has shown by a preponderance of the evidence that Sudler's proffered opinion under Rule 702 and *Daubert* is admissible, and whether Sudler considered other causes for the dust can be addressed on cross-examination.

### d.  Plaintiffs' motion to exclude Ronald Grisez

Plaintiffs also move to exclude several proffered opinions by Crown's expert Robert Grisez. Grisez is the director of product safety at Crown. (ECF 57-2 at 1). In

Grisez's position as director of product safety at Crown, Grisez is responsible for reviewing and evaluating the safety of Crown material handling equipment, monitor and understand Crown equipment and their usage in the field, address safety issues, and ensure Crown meets compliance requirements. (ECF 52-7 at 1). Grisez has a bachelor's of science in mechanical engineering from the University of Dayton. (ECF 57-2 at 42). In preparation for his report, Grisez reviewed deposition transcripts, exhibits, and Wharton's expert report. (ECF 52-7 at 1). Plaintiffs do not argue that Grisez is unqualified to render his proffered opinions. Plaintiffs only argue that several of Grisez's proffered opinions are unreliable. Plaintiffs make several arguments in seeking exclusion that are undeveloped and, at times, difficult to follow. Plaintiffs also cite very little caselaw in their motion to exclude Grisez's proffered opinions. The Court will address each of Plaintiffs' arguments in turn.

### i. Opinion regarding stockpicker's overhead guard

First, Plaintiffs move to strike Grisez's proffered opinion in his report that:

> Had Mr. Cole been trained to use personal fall protection when operating the SP3520-30 and had been using the personal fall protection provided at the time of the accident, he would not have been able to jump from the operator platform and subsequently fall from the top rack in the warehouse. Had Mr. Cole remained on the operator platform, he would not have sustained the injury from this accident.

(ECF 57-2 at 34).

Plaintiffs argue that Grisez's conclusion that Mr. Cole would have been fully protected by the stockpicker's overhead guard structure when the machine went through the ceiling is based "merely on hindsight of photographs after the incident showing that the overhead guard remains intact as it went through the ceiling" and not

on sufficient facts or data or on reliable principles or methods of specialized knowledge. (ECF 57-1 at 18). Plaintiffs also argue that the testimony will not assist the jury because the jury is capable of looking at the photographs and determining whether Mr. Cole acted reasonably in attempting to prevent further harm to himself by getting off the machine. (*Id.*)

In opposition, Crown points to Grisez's deposition, where he testified that the operator platform's structure and the overhead guard provide protection to the operator, and that the operator area was undamaged following the incident. (ECF 62-4 at 20). Grisez also testified that Crown performed tests of the overhead guard and structure to meet ANSI B56.1 safety standards, and that "all these tests that we run to meet the ANSI B56.1 are severe tests to demonstrate that the overhead guard and the structure are sound to provide protection to the operator." (*Id.* at 21). Grisez explains in his report that in accordance with ANSI/ITSDF B561.1 standards, the operator platform is supplied with guarding and personal fall protection, that the guarding is structurally tested and that Crown found that the guard met the requirements for applicable standards. (ECF 57-2 at 10-11). In Grisez's report, he also relies on OSHA's report following the incident in which OSHA found that the overhead guard did not appear to be damaged, and that there were no work orders indicating any repairs to the overhead guard were necessary before the truck was put back in service. (ECF 57-2 at 11). Accordingly, Grisez relies on more than photographs and hindsight in rendering his opinion. Grisez has experience with safety standards in his position at Crown, and Crown has demonstrated by a preponderance of the evidence that Grisez's opinion is

the product of reliable principles and methods under Rule 702. His testimony is also

helpful for the jury because it provides additional explanation about the operator

platform's safety design.

### ii.  Opinion regarding cause of contactors welding

Next, Plaintiffs move to exclude a statement in Grisez's report where he states:

> As the design of the SP3500 is expected to utilize closed contactors to be able to operate the powered components of the truck, it would not be expected that if one contactor tip welded, or remained closed, that would cause another contactor in the same circuit to weld.

(ECF 57-2 at 22).

Plaintiffs argue that Grisez's proffered opinion is not based on sufficient facts or

data, and that Grisez's reasoning underlying his proffered opinion does not lead to his

conclusion. However, in Grisez's report and deposition, he explains how the ED1

contactor is wired to the battery, so when the contactor closes, it provides power

through the fuse, through the P2 contactor, and then to the motor. (ECF 62-4 at 66).

Grisez testified that it is his opinion that the ED1 contactor was fused before the P2

contactor. (ECF 62-4 at 66). Grisez explains that the probability of having the two

contactors fail at the exact same time is so improbable that the safety standards indicate

it's not worth considering that possibility. (ECF 62-4 at 66). Grisez further explains that

the P2 had to have welded after Mr. Cole raised it, and since the contactors can't fuse at

the same time, Grisez opines that the ED1 contactor had to be fused before the P2

contactor. (ECF 62-4 at 66-67). Accordingly, Crown has shown by a preponderance of

the evidence that Grisez's proffered opinion is based on the application of reliable

methodology, and it is admissible under Rule 702.

### iii.  Opinion regarding sequence of welding

Plaintiffs also move to exclude several separate statements made throughout

Grisez's report, but that Plaintiffs represent as one conclusion in their motion:

> "At this time, except for anticipated wear on each of the contactor tips, there
> have been no explicit root cause(s) to explain why ED1 contactor and P2
> contactor tips welded during the same event. ISO 13849-1, 'the simultaneous
> occurrence of two or more faults having separate causes is considered highly
> unlikely and therefore need not be considered.' Although ISO 13849 states
> simultaneous occurrence of two or more faults need not be considered, Crown
> has the expectation through OSHA that wear items such as harnesses, wheels,
> chains, oil leaks, and contactor tips, be inspected according to the Daily Safety
> Check before operating the truck." *Id*. at 23. "Had Mr. Cole performed the Daily
> Safety Check, he would have learned the ED button was not working properly."
> *Id*. at 34. "During my deposition on August 2, 2023, I testified that "to have two
> different contactors' tips weld is an extremely low possibility." *Id*. at 23. "ISO
> 13849-1 states having multiple failures occur at the same time is highly unlikely. .
> ." *Id*. at 23, (DE 57-2 at 23, 34).

(ECF 57-1 at 17) (alterations in original).

Plaintiffs first argue that there is no evidence that the ED1 contactor had failed

before the incident, and that the ED button would not have worked just prior to the

incident. But as already discussed, Grisez explains why he believes the simultaneous

occurrence of two or more faults having separate causes is considered highly unlikely.

(ECF 57-2 at 23). In his report, Grisez explains that a low battery voltage with higher

current demand would have affected all the contactors used on the truck, including the

contactors that did not weld, and that at the time of the report, there is no explicit root

cause to explain why the ED1 contactor and P2 contactor tips welded during the same

vent except for anticipated wear on each of the contactor tips. (*Id*. at 22-23). And during

his deposition, Grisez testified that he did not believe that the two contactors fusing

were the result of a single fault, such as low battery voltage. (ECF 62-4 at 38-40). In Grisez's report, he explains that the "most probable scenario in this instance is the ED1 contactor tips welded first sometime before Mr. Cole used the truck which would allow the subject truck to travel from the charger area to the pick location in the warehouse. Then, after requesting raise, P2 contactor tips welded. (ECF 57-2 at 38).

Plaintiffs also argue that Grisez relies on insufficient and inaccurate facts in supporting his conclusion. Specifically, Plaintiffs argue that Grisez's conclusion that if Mr. Cole had performed the Daily Safety Check, he would have learned that the ED button was not working properly is inaccurate because, Plaintiffs argue, the Daily Safety Checklist does not mention checking or inspecting contactors. (ECF 57-1 at 21). This argument is unavailing and does not support exclusion because, as Crown points out, the Daily Safety Checklist states that the operator must "[m]ake sure the emergency disconnect works." (*Id.*) Plaintiffs also argue that there is no evidence that if Mr. Cole had pressed the emergency disconnect button before operating the forklift that it would have indicated the ED1 contactor was not working properly. That may be so, but that does not render Grisez's proffered opinion unreliable. Instead, that is for Plaintiffs to address on cross-examination. Accordingly, Crown has shown by a preponderance of the evidence that the several statements from Grisez's report that Plaintiffs seek to exclude are reliable and admissible under Rule 702.

#### iv. Statements regarding event codes

Plaintiffs move to exclude statements made in Grisez's report that are not

identified in Grisez's report as one of his enumerated conclusions, but which Plaintiffs

present as one conclusion in their motion:

> Event Codes are intended to be used at the discretion of the service technician,
> not the User, in a manner they see fit as a tool to allow them to quickly and
> efficiently diagnose the issue at hand to be able to repair, if necessary, the truck
> and return it to service for the User." and (sic) "the event codes were not
> intended to be part of any potential litigation…" *Id.* at 24, 37, (DE 57-2 at 24, 37).

(ECF 57-1 at 17).

Plaintiffs argue that Grisez's conclusion that event codes are intended for the

service technician's use only is not based on any facts or reliable principles but rather

unsupported speculation and "self-serving subjective beliefs from an agent of Crown."

(*Id.* at 21). Crown states "these statements are facts, not opinions, which explain the

purpose of Crown's event codes in the lift truck which is well within Mr. Grisez's

knowledgebase [sic] as an engineer at Crown for over 30 years." (ECF 63 at 22). Since

Crown does not intend to introduce Grisez's testimony related to the event codes as

expert opinion under Rule 702, Plaintiffs' motion to exclude under Rule 702 is denied as

moot.

#### v. Opinion regarding personal fall protection

Finally, Plaintiffs move to exclude one of Grisez's opinions and statements in

Grisez's report, which Plaintiffs present as a single conclusion in their motion:

> "Had he followed these instructions [to wear personal fall protection], he would
> not have falling [sic] to the floor surface." *Id.* at 28. "Had Mr. Cole been trained to
> use personal fall protection when operating the SP3520-30 and had been using
> the personal fall protection provided at the time of the accident, he would not
> have been able to jump from the operator platform and subsequently fall from
> the top rack in the warehouse. Had Mr. Cole remained on the operator platform,

he would not have sustained the injury from this accident." *Id*. at 34, (DE 57-2 at 28, 34).

(ECF 57-1 at 18) (alterations in original).

Plaintiffs argue that Grisez's opinion that if Cole had been wearing fall protection gear that he would not have been hurt is not based on sufficient facts or reliable principles.

In Grisez's report, he explains that the operator manual for the stockpicker includes an instruction to put on the operator harness and to attach the lanyard before operating the truck, and that the operator is shown a message on the stockpicker that says "Tether?" to remind the operator to wear the personal fall protection equipment provided. (ECF 57-2 at 24-29). Grisez also explains that OSHA investigated the accident, and found that neither Mr. Cole nor Mr. Thomas were wearing personal fall protection, and that both were inadequately trained on the use of personal fall protection. (ECF 57-2 at 6). In his report, Grisez also states that the photographs of the stockpicker in the OSHA report show that there was a full body harness and self-retracting lanyard. (*Id*. at 13). Grisez explains how the self-retracting lanyard functions like a seat belt, and that if Mr. Cole had been trained to use it and was wearing the self-retracting lanyard and harness, it would have prevented Mr. Cole from falling. (*Id*.) Grisez also testified that the harness is part of the fall protection equipment and is used to prevent operators from falling and hitting the floor. (ECF 62-4 at 23-24).

Plaintiffs argue that Grisez's proffered opinion is not reliable because Grisez did not consider other probable alternative outcomes, such as the possibility that Mr. Cole could have ripped the harness off right before jumping or that Mr. Cole would have

been left dangling in the harness and "injured by either swinging into objects or having objects fall on him when the machine went through the ceiling." (ECF 57-1 at 22). During Grisez's deposition, he was asked about whether Mr. Cole could have taken the fall protection off, and Grisez testified that even if Mr. Cole panicked and wanted to take it off, that Mr. Cole would have had a difficult time unlatching it because it requires some dexterity. (ECF 62-4 at 27-28).

The Court finds that Crown has demonstrated by a preponderance of the evidence that Grisez's testimony about whether Mr. Cole would have been protected had he used personal fall protection, which is relevant to Crown's defense that Mr. Cole was comparatively negligent, is admissible under Rule 702. Plaintiffs may address whether it is possible that Mr. Cole would have been injured regardless of wearing fall protection on cross-examination.

### III.    Crown's motion for summary judgment

Crown moves for summary judgment as to all Plaintiffs' claims. Plaintiffs state in their response in opposition to Crown's motion for summary judgment that they are "withdraw[ing] all claims against Crown, except for their negligent maintenance and repair claim." (ECF 52 at 2). But then Plaintiffs state in a footnote that Ms. Cole "also presents a NIED claim (she was present to observe the injured Kevin), a loss of consortium and services claims." (ECF 52 at 1 n.1). In Crown's reply, it disputes that Plaintiffs' complaint states a negligent infliction of emotional distress claim.

Since Plaintiffs assert that they are only proceeding with a negligent maintenance, loss of consortium, and NIED claims and have no objection to dismissal of

its remaining claims, the Court will only address whether summary judgment is proper as to those claims.

### a. Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Matshushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

To determine whether a genuine dispute of material fact exists, the Court must review the record, construing all facts in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. *Heft v. Moore*, 351 F.3d 278, 282 (7th Cir. 2003). The court must not "sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). The court does not have to conduct research or develop arguments for parties either. *Nelson v. Napolitano*, 657 F.3d 586, 590 (7th Cir. 2011); *see also United States v. Beavers*, 756 F.3d 1044, 1059 (7th Cir. 2014) ("Perfunctory, undeveloped arguments without discussion or citation to pertinent legal authority are waived.").

"To defeat a motion for summary judgment, the non-moving party cannot rest on the mere allegations or denials contained in his pleadings, but must present sufficient evidence to show the existence of each element of its case on which it will bear

the burden at trial." *Robin v. Espo Eng'g Corp.*, 200 F.3d 1081, 1088 (7th Cir. 2000) (internal quotations omitted), *overruled on other grounds by Ortiz v. Werner Enters., Inc.*, 834 F.3d 760 (7th Cir. 2016). "Summary judgment is not a dress rehearsal or practice run; it is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events." *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 859 (7th Cir. 2005) (quotations omitted); *see also Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010).

**b.  Analysis**

Plaintiffs allege that Crown negligently maintained the stockpicker. Crown argues that Plaintiffs' claim fails as a matter of law because Plaintiffs' claim is precluded by the Indiana Products Liability Act ("IPLA"). Crown also argues that, even if Plaintiffs' claim is not precluded by the IPLA, there is no genuine issue of material fact that Crown caused the incident. Crown also moves for summary judgment as to Plaintiffs' request for punitive damages, arguing that no reasonable jury could conclude that Crown acted with intentional misconduct or gross negligence. The Court will address each argument in turn.

**i.  IPLA preclusion**

The ILPA is a statute that "governs all actions that are (1) brought by a user or consumer; (2) against a manufacturer or seller; and (3) for physical harm caused by the product[,] regardless of the substantive legal theory or theories upon which the action is brought." Ind. Code § 34-20-1-1. The IPLA recognizes only three theories of liability: "A product may be defective under the IPLA if it is defectively designed, if it has a

manufacturing flaw, or if it lacks adequate warnings about dangers associated with its use." *Brewer v. Paccar, Inc.*, 124 N.E.3d 616, 621 (Ind. 2019). Crown argues that Plaintiffs' negligent maintenance claim must be dismissed because it is precluded by the IPLA. Plaintiffs argue that the IPLA governs actions against a manufacturer or seller, not a maintenance company, and so the IPLA does not preclude his negligent maintenance claim. Crown did not address Plaintiffs' argument in its reply.

The IPLA only applies to a manufacturer or seller's product, and a "product" under IPLA "does not apply to a transaction that, by its nature, involves wholly or predominately the sale of a service rather than a product." Ind. Code § 34-6-2.1-162.[2] "The repair or refurbishing of a product constitutes a service, while the reconditioning or reconstruction of a product creates a new product." *Baker v. Heye- Am.*, 799 N.E. 2d 1135, 1140-41 (Ind. Ct. App. 2003); *see also Estabrook v. Mazak Corpo*, No. 1:16-CV-87-HAB, 2020 WL 4003490, at *1 (N.D. Ind. July 14, 2020) ("Plaintiff's claim is that those products were designed and manufactured improperly to include the injury-causing gap, not that Defendant damaged those products during service or that Defendant negligently failed to detect or repair the gap. Plaintiff's claim is one under the IPLA, no matter how he wishes to describe it."); *Newell v. Westinghouse Elec. Corp.*, 36 F.3d 576, 577-581 (7th Cir. 1994) (explaining that to the extent plaintiff's injuries were result of a product defect in the elevator, the claim is barred by IPLA, but allowed negligent maintenance claim based on defendant's examination and inspection).

---

[2] The definition of "product" was recodified to Ind. Code § 34-6-2.1-162, effective July 1, 2025. The definition was previously codified as Ind. Code § 34-6-2-114.

Based on the caselaw, the Court finds that Plaintiffs' negligent maintenance claim arising from Crown's alleged negligent repair work of the stockpicker is not precluded by the IPLA. Plaintiff' negligent maintenance claim is based on Crown's repair performance under the maintenance services agreement. (ECF 51-3 at 14). Since repairs are considered "services" rather than "products" under IPLA, and the transaction underlying Plaintiffs' negligent maintenance claim predominately concerns a sale of services, Plaintiffs' negligent maintenance claim arising from Crown's maintenance repairs of the stockpicker are not precluded by the IPLA. *See Baker*, 799 N.E. 2d at, 1140-41.

### ii. Causation

Crown argues that, even if Plaintiffs' negligent maintenance claim is not precluded by the IPLA, that summary judgment is proper because there is no evidence that Crown caused the incident.

The tort of negligence has three elements: "(1) a duty owed by the defendant to the plaintiff; (2) a breach of that duty; and (3) injury to the plaintiff resulting from the defendant's breach." *Rhodes v. Wright*, 805 N.E.2d 382, 385 (Ind. 2004). Crown argues that summary judgment is proper because Plaintiffs cannot establish that this incident was caused by Crown's alleged negligent maintenance, and that the jury would be left to impermissibly speculate about what occurred during the incident. Plaintiffs oppose the motion, and argue that summary judgment should be denied because there is a genuine issue of material fact as to whether Crown negligently caused the incident.

In opposing summary judgment, Plaintiffs invoke the doctrine of *res ipsa loquitur*, an evidentiary rule that allows an inference of negligence to be drawn from a factual scenario. *Newell v. Westinghouse Elec. Corp.*, 36 F.3d 576, 578–79 (7th Cir. 1994) (citing *Pedersen v. White-Evans Elevator Co.*, 511 N.E.2d 460, 463 (Ind. Ct. App. 1987)). However, it does not appear that Plaintiffs need to avail themselves of *res ipsa loquitur* for purposes of defeating Crown's motion for summary judgment.

It is undisputed that Crown sets a maintenance review schedule of the stockpicker's contactors every 60 days or 250 operating hours. (ECF 47-6 at 17). An objective of the planned maintenance is to monitor the wear of the contactors so they are replaced before the tips weld. (*Id.*) Crown trains its maintenance inspectors to observe when or if the contactors need to be replaced. (*Id.*) When a Crown technician inspects a truck, the technician marks a contactor as "OK," which means it is okay or properly functioning, or "R," which means "repair." (ECF 51-2 at 42, 44). The last maintenance visit was by Crown employee David Smith on July 7, 2022. (*Id.* at 66). Before Mr. Cole's incident, Crown did not recommend replacing the ED or pump contactors. (ECF 47-6 at 28). It is undisputed that two of the electrical contactors welded and caused the stockpicker to malfunction. The accident occurred on August 17, 2022, less than 60 days after Smith marked the contactors as "OK" at his July 7, 2022 planned maintenance. While the stockpicker was at Bailey's and operated by Bailey's employees, including Mr. Cole, there is no evidence that others conducted repairs of the stockpicker's contactors.

In opposition, Plaintiffs present Wharton's testimony where he opined that, to determine whether a contactor should be replaced, a technician should evaluate whether the silver alloy is on the majority of the surface. (ECF 47-19 at 142-143). Wharton also opined that a contactor can be in "bad shape" which is "predictive of failure," and that contactors should be replaced before "they get bad enough to fuse." (ECF 47-19 at 140-141). Plaintiffs also present Wharton's testimony where he opines that contactors degrade over time, and that degradation is observable. In Wharton's report, he observed during an inspection of the stockpicker following the accident that the ED2 contactor—one of the two contactors that did not fuse—was pitted, and the material was building up. (*Id.* at 49-50). At Wharton's deposition, he elaborated that the non-fused contactors were of such a condition that they should be replaced, and that the non-fused contactors were previously inspected and approved as OK at the last planned maintenance before the inspection on July 7, 2022. (*Id.* at 143). Wharton concludes that the "extremely degraded condition of the ED1 and P2 contactors should have been obvious on visual inspection just 7 weeks and 79 operating hours previously," and noted that Smith replaced the ED2 contacts following the inspection (ECF 47-18 at 50). Plaintiffs also present Smith's testimony where he testified that, following the accident, he observed the components and that nothing indicated to him that someone else shorted the components or caused them to weld, and he did not observe that the fuse, which controls the current to the component part, had blown. (ECF 51-2 at 28-29, 88). Crown's 30(b)(6) deponent also testified that Crown is not aware of anybody doing anything to the stockpicker from the time that the battery cable was

41

pulled on the day of the accident to when Smith inspected the stockpicker following the accident on August 25, 2022. (ECF 47-6 at 50-51).

Plaintiffs also present evidence that Smith conducted other improper repair work of the stockpicker, including a work order in which Smith performed an inspection of the stockpicker on January 5, 2023, and marked "OK" for "[t]ire and wheel conditions," and "brush and armatures," while another technician inspected the same stockpicker on March 29, 2023 with the same operational hours noted in the January 5, 2023 work order—suggesting that the stockpicker had not been used since the January 5 inspection and remained in the same condition—and came to a different conclusion about the tire and wheel conditions, and the brush and armatures, noting "R" for "repair." (ECF 51-9 at 5-6). In Wharton's report, he opines that Smith previously improperly watered the battery, resulting in corrosion. (ECF 47-18). Plaintiffs also point to Wharton's report where he opines that Smith improperly installed a harness, crimped a connector incorrectly, and blew a 15-amp control fuse. (ECF 47-18 at 52-53). While the evidence is not directly related to the contactors that welded in this case, viewing the evidence in the light most favorable to Plaintiffs, a reasonable jury could infer from the evidence that Smith caused the incident because there is evidence suggesting that Smith has a history of performing improper maintenance work.

In support of its motion, Crown also argues that Mr. Cole failed to do a test of the emergency disconnect. But Plaintiffs point to Crown's 30(b)(6) deponent's testimony where the witness stated that if the ED1 tips failed after the pre-use test, then the ED1 tips would not have provided any notification to the operator at that time. (ECF 47-6 at

57-58). In other words, Plaintiffs have presented evidence that a pre-op testing may not have necessarily prevented the accident, and it is for the jury to determine whether, and to what extent, Mr. Cole was comparatively negligent.

Taking all reasonable inferences in Plaintiffs' favor, there exists a genuine issue of material fact as to whether Crown negligently maintained the stockpicker by not replacing the contactors before they fused, causing the stockpicker to malfunction. Crown's motion for summary judgment as to Plaintiffs' negligent maintenance claim is therefore denied.

### iii.   Punitive damages

Crown also moves for summary judgment as to Plaintiffs' request for punitive damages. Plaintiffs do not address Crown's argument in their response.

"Whether a party may recover punitive damages is usually a question of fact for the fact finder to decide; however, it may be decided as a matter of law." *Gresser v. Dow Chem. Co.*, 989 N.E.2d 339, 349 (Ind. Ct. App. 2013). Punitive damages may be awarded "only if there is clear and convincing evidence that the defendant acted with malice, fraud, gross negligence, or oppressiveness which was not the result of a mistake of fact or law, honest error or judgment, overzealousness, mere negligence, or other human failing." *Id.*

While Plaintiffs' claim is based on Crown allegedly negligently maintaining the stockpicker, Plaintiffs do not designate evidence or argument in their briefing opposing Crown's motion for summary judgment to show that there is a genuine issue of material fact that Crown acted with malice, fraud, gross negligence, or oppressiveness

43

rather than mere negligence to warrant an award of punitive damages. "Summary judgment is not a dress rehearsal or practice run; it is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events." *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 859 (7th Cir. 2005) (quotations omitted); *see also Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). It is not the Court's role to conduct research or develop arguments for Plaintiffs. *Nelson v. Napolitano*, 657 F.3d 586, 590 (7th Cir. 2011); *see also United States v. Beavers*, 756 F.3d 1044, 1059 (7th Cir. 2014) ("Perfunctory, undeveloped arguments without discussion or citation to pertinent legal authority are waived.").

Accordingly, Plaintiffs have not shown that there is a genuine issue of material fact as to whether Plaintiffs are entitled to punitive damages. Crown's motion for summary judgment as to Plaintiffs' request for punitive damages is granted.

### iv.  Loss of consortium claim

In Crown's motion for summary judgment, it argues that Ms. Cole's loss of consortium claim is derivative of Mr. Cole's claim, so if Mr. Cole's claims are dismissed, Ms. Cole's consortium claim should also be dismissed. (ECF 47-2 at 23). "[A] loss of consortium claim cannot be brought when the injured spouse's claim has been adjudicated and lost." *Bender v. Peay*, 433 N.E.2d 788, 792 (Ind. Ct. App. 1982). For reasons stated herein, the Court denies Crown's motion for summary judgment as to Plaintiffs' negligent maintenance claim because there is a genuine issue of material fact as to causation. Accordingly, since the negligent maintenance claim has not been

dismissed, and Crown does not offer any other reason for dismissal of the loss of consortium claim, Crown's motion for summary judgment as to Ms. Cole's loss of consortium claim is denied.

### v. Negligent infliction of emotional distress

In Plaintiffs' response in opposition to Crown's motion for summary judgment, they state in a footnote that Ms. Cole "also presents a NIED claim (she was present to observe the injured Kevin)[.]" (ECF 52 at 1 n.1). In Crown's reply, it states that Plaintiffs' opposition brief "is the first time Plaintiffs attempt to plead a 'NIED claim' on behalf of Selena Cole. Selena Cole only has a pending claim for loss of consortium." (ECF 54 at 3 n.2). The Court agrees with Crown. Plaintiffs' complaint does not state any claim on behalf of Ms. Cole for the negligent infliction of emotional distress. The allegations in the complaint that relate to Ms. Cole only state that "the Plaintiff Selena Cole, the spouse of Plaintiff Kevin Cole, has been deprived of the services and consortium of Kevin Cole, and her comfort and happiness have been impaired, and this deprivation and impairment will necessarily continue for an indefinite period." (ECF 2-1 at 2). Plaintiffs have not moved to amend their complaint to allege a negligent infliction of emotional distress claim as to Ms. Cole, and may not do so in a footnote in their response in opposition to Crown's motion for summary judgment.

### IV. CONCLUSION

For the reasons stated, Crown's motion to exclude the expert opinions of Plaintiffs' retained expert Wharton (ECF 46) is **GRANTED IN PART AND DENIED IN PART**. The motion is **GRANTED** as to Wharton's proffered opinion nos. 1-9, 11, 13, and

14 in his expert report, ECF 46-4. The motion is also **GRANTED** as to Wharton's supplemental report because the supplemental report is untimely. The motion is **DENIED** as to Wharton's proffered opinion nos. 10, and 12 in his expert report, ECF 46-4.

Plaintiffs' motion to exclude the testimony of Crown's experts Samuel Sudler and Ronald Grisez (ECF 57) is **DENIED.**

Crown's motion for summary judgment (ECF 47) is **DENIED IN PART AND GRANTED IN PART**. Crown's motion for summary judgment is **DENIED** as to Plaintiffs' claims for negligent maintenance and loss of consortium; therefore, those claims may proceed. Crown's motion for summary judgment is **GRANTED** as to Plaintiffs' remaining claims, and as to Plaintiffs' request for punitive damages.

SO ORDERED on September 5, 2025.

_/s/ Cristal C. Brisco_
CRISTAL C. BRISCO, JUDGE
UNITED STATES DISTRICT COURT